U. D. MOORE et al *v.* Jack EAST Sr. et al

5-5494                                              464 S. W. 2d 52

Opinion delivered March 1, 1971
[Rehearing denied March 29, 1971.]

*Bethell, Callaway, King & Robertson,* for appellants.

*Kemp & Whitmore,* for appellees.

J. FRED JONES, Justice. This is an appeal by U. D. Moore et al, from a decree of the Pulaski County Chancery Court denying their petition for an injunction to prevent the Little Rock Airport Commission from entering into a contract with the Arkansas Power & Light Company for the installation of electrical power facilities and the furnishing of electrical energy for the lighting of a new parking lot and air terminal for the City of Little Rock without advertising for bids under the provisions of Act 159 of 1949. (Ark. Stat. Ann. § 14-611 [Repl. 1968]).

The City of Little Rock intervened contending that the Airport Commission is simply an agency of the city and that the agreement it contemplates with the Arkansas Power & Light Company is an agreement for electrical distribution and services not within the provisions of Act 159 of the Acts of 1949; and that the arrange-

ment contemplated by the Commission is simply an extension of the city's agreement with the Arkansas Power & Light Company entered into in September, 1958, for the furnishing of lighting service to public streets and ways in the City of Little Rock.

The chancellor dismissed the petition with prejudice and on appeal from the chancellor's decree, the appellants rely on the following point for reversal:

"The making of a contract by a city for the construction and installation of lighting fixtures and facilities for a parking lot at a cost in excess of $10,000.00 is subject to the requirements of Act 159 of 1949, and the chancellor erred in holding to the countrary."

Act 159 of 1949, as digested in Ark. Stat. Ann. § 14-611 (Repl. 1968), reads as follows:

"No contract providing for the making of major repairs or alterations, or for the erection of buildings or other structures, or for making other permanent improvements shall be entered into between the State, or any agency thereof, or any county, municipality, school district, or other local taxing unit, with any contractor in those instances where the estimated cost of such work shall exceed the sum of $10,000.00, unless such taxing unit shall have first published notice of its intention to receive bids therefor once each week for not less than two [2] consecutive weeks in a newspaper of general circulation published in the county in which the proposed improvements are to be made, or in a trade journal reaching the construction industry. The date of publication of the last of such notices shall be not less than one [1] week before the day fixed therein for the receipt of bids. If there be no such newspaper regularly published in the county in which the proposed work is to be done, the notices may be published in any newspaper having a general circulation in such county. Nothing in this Section contained, however, shall be construed

as limiting to two [2] the number of weeks the notices may be published."

The action which brought on this litigation was the action authorized by the Little Rock Airport Commission as indicated by excerpts from the minutes of a regular meeting of the Commission on January 12, 1970, as follows:

"Mr. W. M. Alley, representing Arkansas Power and Light Company, presented a choice of several proposals whereby the Arkansas Power and Light Company would install street and parking area lighting in the new terminal area. These proposals follow for the record.

Mr. Carl Harris spoke to the Commission in opposition to Arkansas Power and Light Company's proposal, advising the Commission that in his judgment the lights should be installed by private contractors. City Attorney Joe Kemp advised the Commission that in his opinion installation of street and parking area lighting in the new airport terminal area by Arkansas Power and Light Company was legal. Thereupon, Mr. Beauchamp moved that plan III of Section 'B', providing for the lighting of parking area and the streets adjacent to the terminal, requiring a monthly cost of $436.70, be adopted by the Commission and that the Airport Manager be authorized and directed to notify proper officials of the City of Little Rock the recommendation of the Commission in this respect. The motion was seconded by Mr. McLean and carried unanimously."

It was stipulated by the parties that on September 30, 1958, the City of Little Rock entered into a contract with the Arkansas Power & Light Company under which the city, in effect, went out of the electric power distribution business, and Arkansas Power & Light Company took over the electrical distribution system then owned by the City of Little Rock. Under this agreement, Arkansas Power & Light Company be-

came the owner of the facilities and agreed to repair, maintain and expand the street lighting system in the City of Little Rock. The contract was for a period of 20 years, and was renewable for five year periods. In the event the contract should expire and not be renewed, Arkansas Power & Light Company had a right to dismantle and remove the facilities.

The appellees contend that the contract now contemplated is only an extension of the original street lighting contract, and the appellants contend that it is immaterial whether the contract they seek to enjoin is an extension of the old contract or a completely new one; they both are covered by Act 159 and that bids must be taken and the contract let to the lowest competent bidder as provided in the act.

In support of the petition for the injunction, Mr. Moore testified that he is a resident of Little Rock and is an electrical contractor. He says that he is familiar, to some degree, with the proposed expansion of the Little Rock Municipal Airport, and that part of the plans for such expansion is to provide lighting fixtures, wiring and so forth. He testified that he would be willing to bid on such project on the basis of furnishing it on a *monthly rental basis as distinguished from selling* it to the city outright. He testified that he had never been offered the opportunity to do so.

On cross-examination Mr. Moore testified that in order for him to furnish electrical energy for the illumination of lamps to be installed under the proposed contract, it would be necessary for him to purchase it from the Arkansas Power & Light Company or the servicing utility. He says that it is possible for him to do this however, and he supposes he would be permitted to resell it to the City of Little Rock.

"Q. You suppose or do you know?

A. No, I don't know. I would assume it is. I would assume that if we installed an electric service out there and paid the deposit, neces-

sary deposits and signed a contract for service they would be obligated to serve us."

Mr. O. V. Holeman, director of rates and research for the Arkansas Power & Light Company, testified that he was familiar with the proposed plans for expansion of the Municipal Airport and of the lighting requirements. He testified that under the proposed contract, the lighting facilities would be of the normal type of ornamental facilities supplied by an underground distribution system, and that the system would be permanent in nature but capable of being removed. He testified that the proposals that the Arkansas Power & Light Company and the city had under consideration would be for lighting service to the airport area, including the streets adjacent to the new airport; and that the proposals were made pursuant to the provisions of their municipal street lighting rate schedule which became effective November 10, 1966. Mr. Holeman then explained that the lighting installation and service would consist of approximately ninety, 400 watt mercury vapor street lighting fixtures mounted on 40 ornamental standard poles approximately 35 feet in height. He then testified as to the cost in monthly charge under the standard street lighting rate schedule for servicing each unit. He testified that under the proposed contract the Arkansas Power & Light Company would install, own and maintain the facilities, and that in the event the term of the contract should end and should not be renewed, the facilities would be dismantled and removed by the company. He testified that the rate schedule under which the city would be charged for service would be the rate schedule approved by the Arkansas Public Service Commission for such service and would cover the cost of production and distribution necessary in furnishing street lighting service, including the purchase and depreciation of steel poles and underground cables and conduits. He testified that the rate schedule base included the annual cost of owning, operating and maintaining the facilities, together with the cost of producing the energy that supplies the street lighting.

On cross-examination Mr. Holeman testified that if the city should install the facilities and own them, that Arkansas Power & Light Company would furnish electrical current and at a lower rate than if the company installed and owned the facilities and were required to maintain and service them. He testified that the electrical energy supplied to cities for street lighting purposes is distributed in exactly the same manner as to residential customers, but at a different rate and under a different schedule approved by the Arkansas Public Service Commission.

We agree with the chancellor that neither the original contract entered into on September 30, 1958, nor the proposed contract for servicing the new airport terminal, access routes and parking area, comes within the provisions of Act 159 of 1949, § 14-611.

It is difficult to tell from the record before us whether the appellants are attempting to force the city into installing, owning and maintaining part of a public utility distribution system, or whether they are attempting to force the city to put them into the public utility distribution and maintenance business. The effect of the appellants' contention would amount to one or the other.

If Act 159 applies to the contract under consideration, there is no reason why it should not also apply to contracts for natural gas and telephone service.

The above testimony as to the type of installation and the cost to the city is beside the issue in this case. The issue is not whether the city could more economically install, own and maintain its own electrical distribution system. The issue is whether the proposed contract comes within the provisions of Act 159, and the determining factor is the ownership of the facilities to be erected or installed, or the improvements to be made under the proposed contract.

We are of the opinion that Act 159 could only apply to such contracts as the city is authorized to make

for major repairs or alterations, or for the erection of buildings or other structures, or for making other permanent improvements. The city only has such contractual power and authority as is granted to it by the legislature, and the legislature has never granted to cities the power or authority to enter into contracts for the repair or alteration of property, or for the erection of buildings or other structures, or for making other permanent improvements, on or to other peoples' property, including that of utility companies.

The decree is affirmed.

BYRD, J., not participating.