Mr. Robert L. Laman, Director Arkansas State Building Services 1515 Building, Suite 700 Little Rock, Arkansas 72201
Dear Mr. Laman:
This is in response to your request for an opinion on several questions concerning the ability of state agencies to enter into lease-purchase agreements in connection with "energy management performance contracts." You note that these contracts are "typically financed as lease-purchases for equipment and installation. They typically run five years or more and are paid for entirely by cost savings generated by the service and/or equipment." You note that "there are three main principles to these contracts. They are assessment and design, the installation of the equipment, and the monitoring and maintenance of the energy management system."
You note that you have reviewed Op. Att'y Gen. 94-101, issued by my predecessor, which involved the ability of institutions of higher education to enter into energy management performance contracts. You note that that opinion, according to your understanding, authorizes the execution of such contracts by state agencies if:
 1. The agreement specifically states that the contract shall terminate at the conclusion of the biennium in which the contract is entered into and,
 2. The agreement is made under a revenue bond using special funds or the agreement is made pursuant to a vote of the electorate.
You indicate that the energy management performance firms believe that Act 912 of 1995 involving state purchasing laws and multi-year contracts was passed to alleviate the issues posed in Opinion 94-101. Your questions in this regard are as follows:
 1. Does the act [Act 912 of 1995] now codified as Ark. Code Ann. 19-11-238, alleviate the issue posed in #1? If so, do the requirements of #2 still have to be met? Is it still the view of your office that a pledge of tax dollars (energy savings) under this scenario may require an election under Amendment 20 in order to withstand a constitutional challenge?
 2. Secondly, most of these contracts involve a hybrid of commodities/services and capital improvements. While some of these contracts involve the purchase of commodities and services that would not be deemed a fixture, portions of the energy management contracts involve the installation of such equipment which would be deemed a fixture. [Opinion 94-101] states that any installation of equipment deemed to be a fixture would be viewed as a capital improvement. Does this mean that a state agency would have to split up the contract in order to satisfy state purchasing laws and the public works laws? If so, would contracts involving fixtures that are deemed to be capital improvements, be mandated to be bid under the public works laws (Ark. Code Ann. 22-9-101 et seq.?) If a contract contained work involving fixtures and non-fixtures, would using only the state purchasing laws be sufficient to withstand a legal challenge?
RESPONSE
In my opinion, in response to the first part of your first question, Act 912 of 1995 made some strides in alleviating the concerns raised in Opinion 94-101, but problematic language remains in the statute amended by that Act. In any event, that act only applies to contracts entered into under the "Arkansas Purchasing Law," and not to contracts for "capital improvements." In addition, the constitutionality of a particular contract will be determined with reference to its particular terms and conditions, and not by reference to a state statute in a vacuum. In response to the second part of your second question, in my opinion the conditions in either #1 or #2 must be met, but not both. In response to the third part of your first question, in my opinion the constitutionality of a particular contract must be determined with detailed reference to its particular provisions. I cannot state in a blanket fashion whether all "energy management performance contracts" will withstand constitutional scrutiny.
In my opinion the question of whether a particular contract is one for "capital improvements" or "commodities or services" will, again, depend on the particular contract. In response to the first part of your second question, it is my opinion as a general matter that the "splitting up" of contracts is unnecessary. In response to the second part of your second question, in my opinion a contract for "major repairs or alterations," or "permanent improvements" (the pertinent language of the "public works" law), must be bid using the provisions of A.C.A. § 22-9-101 et seq.
Whether a particular contract falls within this enumeration will be a question of fact. In my opinion, in response to the third part of your second question, compliance with only the Arkansas Purchasing Law for contracts involving both fixtures and non-fixtures is insufficient.
Question 1 — Does the act, [Act 912 of 1995] now codified as Ark. CodeAnn. 19-11-238, alleviate the issue posed in #1? If so, do therequirements of #2 still have to be met? Is it still the view of youroffice that a pledge of tax dollars (energy savings) under this scenariomay require an election under Amendment 20 in order to withstand aconstitutional challenge?
As an initial matter, before I respond to your multi-part first question, I must note that your reading of Opinion 94-101 is not entirely correct. You indicate two requirements arising from that Opinion: 1) a contract which will terminate at the conclusion of the biennium, and 2) the use of a revenue bond using special funds or an election held on the question. First, Opinion 94-101 does not require that a contract be both
truly terminable each biennium and supported only by special revenues through use of a "revenue bond." Either one or the other of these two factors must be present, but not necessarily both at the same time. Second, your characterization of a contract that will terminate at the conclusion of the biennium is not a complete description of the conclusion reached in Opinion 94-101. It is true that Opinion 94-101
indicates that such a contract, if not structured as a "revenue bond" under Amendment 65, must be terminable at the conclusion of the biennium if no election is held in accordance with Amendment 20. The Opinion indicates that such contracts must be "truly terminable" each biennium. There is more to a "truly terminable" contract, however, than a clause stating that the contract is to terminate at the conclusion of the biennium. Other factors come into play. Among them are the applicable remedies in the case of non-renewal or non-appropriation of funds. Opinion 94-101 discusses the fact that there must be a reasonable "escape hatch" from the contract by the lessee, with the only remedy of the lessor being to retake the equipment. Opinion 94-101 at 10. If too many safeguards are placed in the contract which favor the lessor in the case of non-renewal or non-appropriation, the ability to terminate or not to renew the contract may be illusory, and thus the contract not "truly terminable." This type of analysis accounts for the intensely factual nature of the inquiry into whether such a contract is in conformity with the constitution.
In the first part of your first question, you reference Act 912 of 1995. That act amended an existing statute, A.C.A. § 19-11-238, which is a part of the "Arkansas Purchasing Law." The statute, with the recent Act 912 language emphasized, now provides as follows:
 (a) SPECIFIED PERIOD. Unless otherwise provided by law, a contract for commodities or services may be entered into for periods of not more than seven (7) years if funds for the first fiscal year of the contemplated contract are available at the time of contracting. Payment and performance obligations for succeeding fiscal years shall be subject to the availability and appropriation of funds therefor.
 (b) DETERMINATION PRIOR TO USE. Prior to the utilization of a multi-year contract, it shall be determined in writing that:
 (1) Estimated requirements cover the period of the contract and are reasonably firm and continuing; and
 (2) Such a contract will serve the best interests of the state by encouraging effective competition or otherwise promoting economies in state procurement; and
 (3) In the event of termination for any reason, the contract provides for cessation of services and/or surrender by the state of the commodities and repayment to the state of any accrued equity.
 (c) TERMINATION DUE TO UNAVAILABILITY OF FUNDS IN SUCCEEDING YEARS. Original terms of such multi-year contracts shall terminate on the last day of the current biennium, and any renewals by the state based upon continuing appropriation shall not exceed the next succeeding biennium. When funds are not appropriated or otherwise made available to support continuation of performance in a subsequent year of a multi-year contract, the contract for such subsequent year shall be terminated and the contractor may be reimbursed for the reasonable value of any nonrecurring costs incurred but not amortized in the price of the commodities or services delivered under the contract. The cost of termination may be paid from:
 (1) Appropriations currently available for performance of the contract;
 (2) Appropriations currently available for procurement of similar commodities or services but not otherwise obligated; or
 (3) Appropriations made specifically for the payment of such termination costs.
As noted previously, this statute appears in the "Arkansas Purchasing Law," and thus applies only to the purchase of "commodities and services" as those terms are defined in A.C.A. § 19-11-203 (Supp. 1999). The 1995 act to which you refer made three changes to this statute, which are emphasized above. It increased the number of years referred to in subsection (a) from five to seven, added (b) (3) and added the first sentence in (c).
Although in my opinion Act 912 of 1995 added language of some use in alleviating the issues discussed in Opinion 94-101, problematic language remains in that statute. As an initial matter, it is difficult to reconcile, in my opinion, the authorization for seven-year contracts in subsection (a), with the new language of subsection (c), which requires the termination of such contracts on the last day of the current biennium, with any renewals on a biennium-by-biennium basis. Subsection (a) appears to authorize up to a seven year contract, while subsection (c) appears to authorize, at the most, only a two year contract, which may be "renewed."[1] These two provisions appear inconsistent.
Additionally, although the new language of subsection (b)(3) is helpful in requiring, upon termination, the cessation of the services, surrender of the commodities, and repayment to the state of any accrued equity, this subsection does not make clear whether cessation and return of the equipment is the only remedy of the lessor. The statute, as amended, may still be construed to acquiesce to various burdensome remedies on the part of the lessor in the event of non-renewal or non-appropriation, notwithstanding that the equipment has been returned, services have ceased, and any equity of the state has been returned.
A similar concern arises from the language of the first sentence of subsection (c), which governs termination for non-appropriation of funds. That sentence provides that all contracts will terminate at the conclusion of the current biennium, with renewals on a biennium-by-biennium basis. As noted previously, and as discussed more thoroughly in Opinion 94-101, there is more to a "truly terminable" biennial contract than the fact that it terminates at the conclusion of the biennium. Again, the affording of a reasonable "escape hatch" to the lessee is important. If the legislature's option to choose to not appropriate funds is not a practical possibility, our Supreme Court may find this problematic. Cf. Brown v. City of Stuttgart, 312 Ark. 97,847 S.W.2d 710 (1993).
Finally, the remaining two sentences in subsection (c), which were left untouched by Act 912 of 1995, are problematic. This portion of the statute refers to the contractor being reimbursed, in the event of non-appropriation, for "the reasonable value of any nonrecurring costs incurred but not amortized" in the contract. A.C.A. § 19-11-238 (c) (second and third sentences). These sentences do not appear easily reconcilable with the new language added by Act 912, and, although there is a "reasonable[ness]" requirement, may authorize the type of burdensome charges or penalties on non-appropriation which are cause for concern under constitutional analysis.
In my opinion, therefore, the language added by Act 912 is somewhat helpful in alleviating the constitutional concerns discussed in Opinion94-101, but problems remain in the amended statute, and the statute itself is of limited applicability.
A response to the second part of your first question is unnecessary, as, in my opinion, Act 912 of 1995 did not eliminate all problems discussed in Opinion 94-101. I must note, however, that the two factors you enumerate as being required by Opinion 94-101 (a contract that terminates at the conclusion of the biennium and a revenue bond backed by special funds) are disjunctive requirements, rather than conjunctive. Absent an election, either a contract must be truly terminable each biennium or it may be structured as a revenue bond and backed by special funds. A contract need not meet both requirements in any case.
In response to the third part of your first question, in my opinion the question of whether an election will be required to support a energy management performance contract in the form of a lease purchase agreement will depend upon the particular terms and provisions of the agreement. I cannot state, as a general matter, whether such contracts are constitutionally permissible without detailed reference to the individual provisions of the contract. You have enclosed copies of two draft financing documents given to you. I will not analyze the provisions of these documents in detail, but will state that in my opinion they contain some problematic provisions. These provisions include acceleration clauses, the absence of any provision for the payment of the state's equity on termination (consistent with A.C.A. § 19-11-238, if applicable), provisions for attorneys fees and court costs, termination amounts payable by the lessee on termination, liquidated damages provisions and a provision requiring, if the contract is terminated for non-appropriation, the making of payments to the lessor in the event the lessee subsequently enters into a later contract for similar services. Some of these provisions may not be objectionable standing alone, but they bear on the reasonableness of the "escape hatch" afforded the state under the contract.
Question 2 — Secondly, most of these contracts involve a hybrid ofcommodities/services and capital improvements. While some of thesecontracts involve the purchase of commodities and services that would notbe deemed a fixture, portions of the energy management contracts involvethe installation of such equipment which would be deemed a fixture.[Opinion 94-101] states that any installation of equipment deemed to be afixture would be viewed as a capital improvement. Does this mean that astate agency would have to split up the contract in order to satisfystate purchasing laws and the public works laws? If so, would contractsinvolving fixtures that are deemed to be capital improvements, bemandated to be bid under the public works laws (Ark. Code Ann. 22-9-101et seq.?) If a contract contained work involving fixtures andnon-fixtures, would using only the state purchasing laws be sufficient towithstand a legal challenge?
The first part of your second question is whether a state agency would have to "split up" a contract which includes both fixtures and non-fixtures in order to satisfy both the state purchasing laws and the public works laws. As noted earlier, and in Opinion 94-101, the "Arkansas Purchasing Law" applies to the purchase of "commodities" and "services," and the "Arkansas State Building Services Act" applies to "capital improvements," including "utilities" and other "appertaining improvements." See A.C.A. § 22-2-102 (Repl. 1996). The "public works" law refers to contracts "providing for the making of major repairs or alterations, for the erection of buildings or other structures or for making other permanent improvements. . . ." A.C.A. § 22-9-203(a) (Supp. 1999). In my opinion the question of whether a particular contract must be effected through use of the Arkansas Purchasing Law or the Arkansas State Building Services Act and the public works law will depend upon the object and nature of the particular contract. I cannot state that it is a requirement that all mixed contracts be "split up," although I do not see any legal prohibition against this course of action. There is no provision in any of the aforementioned laws that expressly provides for the awarding of contracts comprised of both "appertaining improvements" and commodities and/or services. The law is unclear, therefore, as to which set of laws is applicable in such instance. In my opinion, however, a contract that includes "appertaining improvements" must be let in accordance with the "Arkansas State Building Services Law." See
A.C.A. § 22-2-102.[2] Whether compliance must be had with the Arkansas Purchasing Law for any commodities or services attending such contracts is not as clear. Section 19-11-203 (14)(E) (Supp. 1999) of the Arkansas Code, however (a portion of the Purchasing Law) exempts from the Purchasing Law "[c]ontracts awarded by agencies for the construction of buildings and facilities and for major repairs. These contract exemptions shall not extend to the procurement of any commodities not otherwise exempt, which are to be furnished by the agency under any such contract." (Emphasis added). It appears, therefore, that commodities to be provided by the contractor, and not the agency, do not have to comply with the Purchasing Law. Again, the question will turn heavily on the particular improvements, commodities and services provided under the contract in question.
In my opinion, in response to the second part of your second question, The applicability of the "public works" law will depend upon whether the contract is one for "major repairs or alterations," "buildings or structures" or other "permanent improvements." See A.C.A. § 22-9-203
(Supp. 1999). See also generally, Moore v. East, 250 Ark. 43,464 S.W.2d 52 (1971) and Conway Corp. v. Construction Engineers, Inc.,300 Ark. 225, 778 S.W.2d 919 (1989), cert. denied, 494 U.S. 1080 (1990). This language is similar, but not identical to the language of the State Building Services Act, which refers to "appertaining improvements." Again, reference to an individual contract and the improvements, commodities and services to be provided thereunder would be necessary to determine the question in a given instance.
In my opinion, in response to the third part of your second question, and consistent with the discussion above, compliance with the Arkansas Purchasing Law alone is not sufficient where the contract is one containing "appertaining improvements." See generally, again, A.C.A. §19-11-203 (14)(E) (Supp. 1999).
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] The concept of "renewal" of a contract generally contemplates the execution of a new contract, as opposed to the "extension" of an existing contract. See generally, Montgomery Ward Company v. Metzger,216 Ark. 88, 224 S.W.2d 368 (1949) and 17 C.J.S. Contracts § 449.
[2] See also "Arkansas State Building Services Minimum Standards and Criteria" at § 1-108 (defining "construction" as the "making or forming [of] an improvement by combining parts, labor, or materials; the erection, alteration, or repair of a structure or physical object. Normally bid through State Building Services" and defining "commodity" as "a product of commerce which requires no additional labor to serve its intended function. Normally bid by State Purchasing Division, Department of Finance and Administration.")